IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 28, 2018

## STATE OF TENNESSEE v. STEPHEN DOANTAE LESTER

**Appeal from the Criminal Court for Hamilton County**
**No. 289979   Thomas C. Greenholtz, Judge**

_____

**No. E2017-02154-CCA-R3-CD**

_____

Defendant, Stephen Doantae Lester, was convicted of felony murder and especially aggravated robbery.  On appeal, Defendant argues that the evidence is insufficient to support his convictions; that the trial court erred by admitting evidence of Defendant's gang affiliation and rank; that Defendant was deprived of a fair trial by statements made by the State during closing arguments and by juror misconduct; that the trial court erred in failing to instruct the jury on certain lesser-included offenses; and that the cumulative effect of these errors deprived Defendant of a fair trial.  Upon our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

Jonathan Wilson (on appeal), Cleveland, Tennessee, and Dan Ripper (at trial), Chattanooga, Tennessee, for the appellant, Stephen Doantae Lester.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams and Lance Pope, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Procedural and Factual Background*

On November 13, 2013, Defendant and Carmisha Shade Lay were indicted by the Hamilton County grand jury for premeditated first degree murder, first degree felony murder, especially aggravated robbery, and conspiracy to commit aggravated robbery. Codefendant Lay was also charged with filing a false police report and tampering with evidence. The State proceeded to trial against Defendant in December 2015 on only the charges of felony murder and especially aggravated robbery.[1]

At trial, Codefendant Lay testified that she agreed to plead guilty to second degree murder, filing a false report, and tampering with evidence with an effective fifteen-year sentence in exchange for her truthful testimony against Defendant. Codefendant Lay testified that she had known Defendant since 2010. She and Defendant were both in a gang, the Athens Park Bloods. She held the rank of Y-G, or young gangster, while Defendant held the rank of Y-O-G, or young original gangster, which was a higher rank within the gang. Defendant often went by the nicknames Thee-Thee or B-Dogg, and Codefendant Lay went by the nickname Peaches. Codefendant Lay testified that in January of 2013, Defendant was her boyfriend and occasionally stayed the night at her house on the corner of O'Rear Street.

At some point, Defendant told Codefendant Lay that he wanted to rob somebody to get money and asked her if she knew "BG." Codefendant Lay testified that BG was the nickname of Edward Glenn, Jr., the victim in this case. Codefendant Lay had known the victim since she was sixteen years old; he was her ex-boyfriend, but they remained "sexually involved" and would get together to do drugs. Codefendant Lay testified, "I knew BG and he had money and that would be an easy robbery and that we could just rob him and get the money." Initially, the plan was for Codefendant Lay and Jazmonyque Adams, her grandmother's foster daughter, to dance for the victim, but the plan fell through because Codefendant Lay and the victim could not settle on a price.

Sometime around midnight on January 10, 2013, Codefendant Lay received a text message from the victim stating that he was coming over to her house. She and the victim did drugs together, including marijuana, cocaine, and ecstasy. Codefendant Lay took a shower and then texted Defendant to let him know that the victim was at her house so that they could enact their plan to rob him. Codefendant Lay testified that she texted Defendant at the phone number "223-xxxx" (the "223 number") and that she had never texted anyone else at that number. Codefendant Lay explained that she used her grandmother's phone with the phone number "394-5xxx" to text Defendant. Codefendant Lay also had another phone that Defendant had given her; it was not

---

[1] The record contains court minutes reflecting that the counts of the indictment charging premeditated first degree murder and conspiracy to commit especially aggravated robbery were dismissed during the May 26, 2017 sentencing hearing, but no judgments for those counts are in the record on appeal. The trial court should enter judgments reflecting the disposition of each count in the indictment. *See State v. Davidson*, 509 S.W.3d 156, 217 (Tenn. 2016).

activated, but it contained a picture of Codefendant Lay and Defendant dated January 5, 2013, and had the 223 number saved as a contact under the name "number one hubby."

Text message logs from the 223 number that were entered into evidence showed that Codefendant Lay initially texted Defendant at 3:22 a.m. Defendant responded, "on my way." Codefendant Lay texted Defendant that he should "wait" because she wanted "to make it look good." Defendant texted, "We on deck me n donkie!" Codefendant Lay identified "Donkie" as the nickname of Eric McReynolds, another member of the Athens Park Bloods. Codefendant Lay texted that the victim "ain't been here long enough" and that she did not want it to "look like a set up." Defendant told her to text him "when u rdy" and to "keep yo emotions in check." Codefendant Lay testified that she changed her mind and no longer wanted to go through with the robbery, so she attempted to convince Defendant that she and the victim had left her house. At 4:00 a.m., Codefendant Lay told Defendant that she was going to stop texting him.

Codefendant Lay testified that she and the victim were in the bedroom engaging in oral sex when Defendant and Mr. McReynolds came into her house. Defendant pulled Codefendant Lay off the bed, grabbed her by the neck, put a gun to her head, and held her against the wall while Mr. McReynolds struck the victim about the face and head. Both men were wearing bandanas around their faces. Both men had guns, and Codefendant Lay identified Defendant's gun as "sort of like a police gun," and Mr. McReynolds's gun as a revolver. They did not say anything to Codefendant Lay but demanded money from the victim. The victim said that there was money in his pants on the floor. The victim did not resist or fight back in any way. Nevertheless, Defendant told Mr. McReynolds to shoot the victim, and he did. Defendant commanded Mr. McReynolds to "shoot him again," and he did. Defendant and Mr. McReynolds then left the house, taking the victim's pants with them.

Codefendant Lay shook the victim, but he was unresponsive. Codefendant Lay grabbed the victim's phone and ran across the street to her grandmother's house. Along the way, Codefendant Lay dropped the victim's phone and took off the back and battery. At her grandmother's house, Codefendant Lay woke everyone up to let them know that someone had been killed at her house. Codefendant Lay asked her grandmother to call the police. Codefendant Lay later went back to her house with Ms. Adams to retrieve the cell phone she had been using and delete all of the text messages on it. Codefendant Lay's mother, Latonya McClendon, drove Codefendant Lay to her aunt's house on Belmeade Avenue. Along the way, Codefendant Lay tried to call Defendant at the 223 number, but the calls kept going straight to voicemail.

Codefendant Lay was eventually taken into custody and interviewed by the police later that day. She testified that she was under the influence of drugs and alcohol at the time and admitted that she lied in order to protect herself and Defendant. Codefendant

Lay initially told the police that she "didn't know who the dudes was [sic]" who came into her house and shot the victim, stating that their faces were covered by bandanas. She also told the police that she was no longer in a gang. When she realized that the police knew she was lying, Codefendant Lay told them about Defendant's involvement but claimed not to know the second person. Codefendant Lay testified that she did not know Mr. McReynolds's real name at the time and that she could not remember if she told the police the nickname "Donkie." Codefendant Lay told the police that both she and Defendant were in a gang, that Defendant had no rank within the gang, and that she was a "little homie" or a "nothing" within the gang. Codefendant Lay admitted that she "still left things out" of the second portion of the interview.

After the interview, Codefendant Lay was arrested for felony murder. While in jail, Codefendant Lay continued to communicate with Defendant by letters. One of the letters written by Defendant and signed "Daddy" was entered into evidence. In it, Defendant explained that Codefendant Lay's statement could implicate them in a conspiracy under the federal RICO Act. Defendant wrote,

> In our situation, the established criminal enterprise is tha' hood 'Athens Park,' do you understand so far sweetheart? OK, I know this don't gotta be explained to you in great detail, because you've experienced 1st hand (through Ko-Ko, Lare Dog, and plenty more) How foul them boys' play.

Codefendant Lay testified that Lare Dog is "the big homie on the hood," or "someone that has status" in the gang. Defendant's letter encouraged Codefendant Lay to retract her statement implicating him so that the case would not be transferred to federal court. Defendant wrote,

> Now if you still refuse to do the right thing as mention on the first page, and continue on with these white folks, like they care anything about you (and they don't even know you), then this will become a life threatening issue.

During cross-examination, trial counsel highlighted the immediately following sentence:

> Otherwise this will be nothing, because with you retracting yo statement by finally telling tha' truth, then there's no RICO conspiracy, there's not even RICO because I had nothing to do with this supposely criminal activity.

On cross-examination, Codefendant Lay testified that the victim was wearing boxers and a t-shirt when he was shot. Codefendant Lay was wearing only a bra and panties, so she put on a striped sundress before she ran over to her grandmother's house. Codefendant Lay admitted that she did not call 9-1-1 immediately to get medical help for

- 4 -

the victim. She told her "granny that [she] didn't want to call the police because [she] was on the run for probation violations." She denied that she told Ms. Adams to lie for her. Codefendant Lay testified that she owned a dog, a mean female pit bull, which was chained to the front porch; Codefendant Lay had to hold the dog to let the victim into her house. Codefendant Lay denied changing anything at the scene, untangling her dog, or touching the victim's body or clothing when she went back to her house to retrieve the phone she had been using. Codefendant Lay admitted that without the plea bargain, she was facing a life sentence of 51 years and that she entered into the plea just a few weeks before trial.

Codefendant Lay testified that her relationship with Defendant was not based on her membership in the gang. Trial counsel entered into evidence three letters written by Codefendant Lay to Defendant while they were in jail. In the first letter, Codefendant Lay wrote, "I could not dare stand to see you with nobody but me." In the second letter, Codefendant Lay wrote, "Really I don't no [sic] why I did what I did to you I no [sic] I thought it was the end of us that u would run off and stunt with the next bitch. Really but it's really no excuse for me putting you behind bars." In the third letter, Codefendant Lay wrote,

> I love you I can't live without you baby what I did was cowardness, lies, decietfulness, disloyalty. . . . I was scared of losing you baby and I no [sic] that no exception but all I can do is say sorry and ima do what I have to so that if I lose you I will do my time alone. . . . Sorry for taking away from you life by put-n behind bars.

However, Codefendant Lay denied that she "lied on [Defendant] pertaining to this case" and agreed that "this is not the way" to make sure that he did not get with another woman.

Ella Lay testified that she was Codefendant Lay's grandmother. Ms. Lay met Defendant briefly in January of 2013 and knew that he stayed some nights at Codefendant Lay's house, which was located across the intersection from Ms. Lay's house. Ms. Lay was also acquainted with the victim as a friend of Codefendant Lay. On the night of January 9, 2013, Defendant and Codefendant Lay were at Ms. Lay's house along with Ms. Adams; Latonya McClendon, Ms. Lay's daughter and Codefendant Lay's mother; and Ms. Lay's husband.[2] Defendant and Codefendant Lay left early in the evening, saying that they were going to a game in Atlanta. Everyone else eventually went to sleep in the house.

---

[2] Neither Ms. McClendon nor Ms. Adams testified at trial.

Around 3:00 a.m. on January 10, Ms. Lay woke up because of an asthma attack. She sat at the kitchen table to give herself a breathing treatment with her nebulizer. Afterwards, she fell asleep at the table. She was awakened when she "heard just a pop. You know like a gun pop or something." When she looked out her window, she saw "a couple of figures" leaving Codefendant Lay's house. Ms. Lay closed her blinds and sat back at the table. She then heard Codefendant Lay banging on the door and windows, saying that "someone had killed her friend." Everyone in the house woke up to see what was going on. Codefendant Lay was "screaming and hollering and crying and just saying someone was trying to, you know, kill her and stuff like that." Ms. Lay went over to Codefendant Lay's house to see if she could help Codefendant Lay's friend. She saw a pair of legs sticking out of the bedroom door. She called out to the victim to ask if he was okay. The victim did not move or respond. Ms. Lay was scared and went back to her house to call 9-1-1. By the time she got back, Codefendant Lay and Ms. McClendon were gone.

Records show that the call was placed to 9-1-1 at 5:21 a.m. A recording of the 9-1-1 call was played for the jury. In it, an emotional Ms. Lay reported that she heard shots at her granddaughter's house and that her granddaughter's boyfriend had been shot in the head and appeared to be dead. Ms. Adams then got on the phone and stated that she was in the house during the shooting. Ms. Adams reported that "two dudes," whom she described as two black men wearing all black, came in through the front door while she was asleep and held a gun to her head. Ms. Adams stated that she did not know who the men were, what they looked like, or what the gun looked like because it was dark and everything happened so fast. Ms. Adams said that the men ran off with the gun after the shooting. At trial, Ms. Lay admitted that what Ms. Adams had said on the 9-1-1 call about being at Codefendant Lay's house was not true. Ms. Lay also admitted that she lied when she told the police that Codefendant Lay was in Atlanta. Ms. Lay explained that she initially lied about Codefendant Lay's location because "I was in fear for her life."

On cross-examination, Ms. Lay estimated that she heard the gunshots around 4:00 a.m. She did not recall telling police that she heard gunshots at 5:15 a.m. Ms. Lay admitted that she could not tell if the two figures running from Codefendant Lay's house were men or women. She did not recall telling police that the figures were two black males, and she did not hear Codefendant Lay identify either person. After Codefendant Lay came over to Ms. Lay's house saying that her friend had been shot, Ms. Lay did not immediately go over to her granddaughter's house because she was trying to calm Codefendant Lay down and find out what happened. Ms. Lay denied consulting with Codefendant Lay or anyone else about how to handle the situation or what to say on the 9-1-1 call. Ms. Lay saw Codefendant Lay and Ms. Adams talking, but she denied hearing Codefendant Lay tell Ms. Adams to lie for her. Ms. Lay admitted lying about Codefendant Lay being in Atlanta but denied telling anyone that Ms. Adams was at the

house on O'Rear Street when the victim was shot or that she saw Ms. Adams exiting the house in a frantic manner. When Ms. Lay went to Codefendant Lay's house to check on the victim, she recalled that he was wearing pants and shoes, though she could not recall what they looked like.

Officer Jeremy Winbush of the Chattanooga Police Department responded to the 9-1-1 call at 5:23 a.m. on January 10, 2013. He initially spoke to the complainant, Ms. Lay, at her home and was told that someone had been shot in the house across the intersection. Officer Winbush did not recall seeing a dog on the front porch of the O'Rear Street house, though he was aware of a dog being associated with the residence. Once he made entry into the house, Officer Winbush saw a "heavy set black male" lying on the floor of the bedroom bleeding from gunshot wounds. Officer Winbush could tell the victim was not breathing. The victim was not wearing any pants, underwear, or shoes. Officer Winbush did not find any other clothing, identification, or weapons. Next, Officer Winbush took statements from Ms. Lay and Ms. Adams. He understood Ms. Adams to be an eyewitness to the shooting. According to Officer Winbush's report, Ms. Lay reported that she heard gunfire around 5:15 a.m. She looked out her window and saw two black males fleeing the O'Rear Street house. Then, she saw Ms. Adams exit the house yelling frantically that someone had been shot. Ms. Lay reported that she went into the O'Rear Street house and saw the victim lying on his back, bleeding from the face.

Greg Mardis, a crime scene investigator for the Chattanooga Police Department, took photographs of the crime scene and collected evidence. A picture of the victim showed that he was wearing only a pair of socks and a white t-shirt pulled up on his chest. He collected a cell phone from a purse, Codefendant Lay's identification, all of the bedding, a pair of white Nike shoes in the entryway to the bedroom, and keys, cigarettes, and a jacket from inside the bedroom. Investigator Mardis found a loose bullet underneath where the victim had been lying and another bullet that had gone through the bedroom door and embedded in the wall behind it. He did not recover any shell casings. Investigator Mardis did not recall seeing a dog on the scene, though he did take pictures of a chain and dog bowl on the front porch. On cross examination, Investigator Mardis testified that he did not recall finding a cigarette butt near the victim or receiving any items collected by Investigator Montijo.[3] Investigator Mardis agreed that a cigarette butt would be a potential source of DNA evidence. He testified that the front door of the O'Rear Street residence could not be locked. He noted the damage to the latch on the front door appeared to be old because there was no corresponding debris on the ground.

---

[3] This individual did not testify, and his first name, other than the initial J. on reports entered into evidence during the motion for new trial hearing, is not contained in the record.

Detective Lucas Fuller was assigned as the lead investigator in this case. When he walked through the house on O'Rear Street, he noted the odor of marijuana. The victim was lying in the entryway to the bedroom and was nude from the waist down. Detective Fuller discovered that Codefendant Lay was not in Atlanta but was at a house on Belmeade Avenue. Codefendant Lay was taken to the police station to be interviewed, along with Ms. Lay, Ms. McClendon, and Ms. Adams. The house on Belmeade Avenue was searched, and the victim's cell phone was found hidden under some trash in a trash can in the kitchen. The phone had been taken apart and the battery removed. Also recovered from that house were a striped sundress and another cell phone hidden in a basket.

Defendant turned himself in on January 11, 2013. Defendant's hands were swabbed for gunshot residue, and he submitted a buccal swab for DNA testing. Detective Fuller interviewed Defendant, and the recording was entered into evidence. Defendant was read and waived his *Miranda* rights. Defendant stated that he was at his girlfriend Shikia's house from Wednesday night, January 9th, until Thursday afternoon, January 10th, when he was picked up by his cousin. Defendant was not sure what time he got to his girlfriend's house on Wednesday night other than "It was late." They "chilled" and watched television. In the morning, Defendant ate some cereal while his girlfriend got ready for work. Defendant's cousin picked him up between 3:00 and 4:30 p.m. They went to Sam's Club and then picked up her kids from the bus stop. Then Defendant "went with another female" that he had recently met. Defendant stated that his current phone number was "215-xxxx" and that his old phone number was "394-0xxx", but that phone was "messed up." Defendant admitted that he used to be a member of the Athens Park gang but stated that he did not have any rank within the gang. Defendant recognized a picture of Codefendant Lay and said that he knew her as "Peaches." He had known Peaches for two or three years, stating that he "just kn[e]w her around" and that they "done f***ed before" but were "nothing serious." He knew that Peaches lived on O'Rear Street. Defendant denied knowing the victim. Defendant denied any involvement in or knowledge of the victim's homicide, even when Detective Fuller told him that they knew that Defendant was not the one who pulled the trigger.

After Detective Fuller spoke to Defendant's girlfriend and cousin, he obtained warrants for Defendant's arrest. Defendant was interviewed again, and that recording was also entered into evidence. Defendant was told that "the girl that you had all this set up with[,] she's already talked." In addition to the police having gotten Defendant's name and description from Codefendant Lay, Defendant was told that phone records for the 223 number implicated him and that his girlfriend confirmed that Defendant used the 223 number. Defendant adamantly denied having a 223 number or being involved in the death of the victim.

Detective Fuller obtained a court order for call and text logs for both the victim's phone and the 223 number. The subscriber information for the 223 number had no name. The call logs for the 223 number from January 1 to January 13, 2013, show a plethora of calls between the 223 number and numbers known to belong to people associated with Defendant, including his girlfriend, cousin, and mother as well as Codefendant Lay and her mother. The 223 number did not make any calls after 3:35 a.m. on January 10, 2013, and all of the calls to that number, including about a dozen in a row from Codefendant Lay, show the code indicating that they were either sent to voicemail or call forwarding.

Detective Fuller subsequently obtained a search warrant for the contents of the text messages sent to and from the 223 number. A selection of text messages sent between January 4 and January 9, 2013, reference the names "b dogg," "Thee Thee," and "Stephen." One message sent to the 223 number on January 6, 2013, asks "What is your middle name, deunte' , can I call you that?" The 223 number responds, "Doantae. N yea u kan ull b tha 1st n only one my mama kall me D." On January 9, 2013, the 223 number received a message from a phone number known to belong to Defendant's mother stating, "Hey Stephen how r u son[?]" All of the text messages sent to and from the 223 number on January 10, 2013, were entered into evidence. This included the texts between the 223 number and the phone number being used by Codefendant Lay leading up to the robbery.

After Defendant was arrested, he made several phone calls from jail. In one call, the recording of which was entered into evidence and played for the jury, Defendant asked his mother to change the password for and delete his Facebook account. Because of this phone call, Detective Fuller obtained a search warrant for Defendant's Facebook account. In several Facebook messages, including one on January 9, 2013, Defendant tells different people that his cell phone number is the 223 number. However, in other messages, Defendant says that his number is "423-394-0xxx," one of the numbers he mentioned during his interview with the police. Defendant said in one message that his name is "B-Dogg" and in another that his "old page" was under the name "THEE THEE LESTER."

On cross examination, Detective Fuller agreed that the subscriber information for the 223 number was not in Defendant's name or any of his known nicknames. Detective Fuller testified that he was familiar with the concept of a community phone, or a phone shared by a group of people. Detective Fuller admitted that several of the text messages sent to the 223 number mentioned the name Park. Detective Fuller explained that Park was most likely a reference to the Athens Park gang but agreed that it could be a message to "whoever Park is." Detective Fuller agreed that calls to the 223 number continued after Defendant's arrest on January 11, 2013. Detective Fuller testified that he interviewed Eric McReynolds on January 22, 2013, in connection with this case but that no arrest warrant had since been issued. Detective Fuller explained on redirect

examination that his investigation into Mr. McReynolds was ongoing as of the time of Defendant's trial.

Dr. James Metcalfe testified that he was the chief medical examiner and that he performed the autopsy of the victim. Dr. Metcalfe testified that the victim died from gunshot wounds to the back. There was one entry wound to the victim's upper back with a corresponding exit wound on the victim's chest. That bullet struck the left lung and the heart, puncturing holes in the victim's heart and causing massive bleeding. Dr. Metcalfe testified that wound was not survivable. Another bullet entered the right side of the victim's back, travelled down and to the left through the victim's ribs, diaphragm, and fatty tissue around the intestines, stopping under the skin in the abdominal wall. A third entry wound on the victim's right buttock exhibited a slightly different trajectory than the other two wounds. Based on the lack of stippling and gunpowder, Dr. Metcalfe opined that the shots were fired more than two feet away from the victim. The victim's blood tested positive for both caffeine and marijuana. The victim also had a bruise on the top of his head. On cross-examination, Dr. Metcalf did not recall a cigarette butt being found with the body and being turned over to Investigator Montijo by the evidence technician.

Steve Scott, a firearms examiner with the Tennessee Bureau of Investigation ("TBI"), received four fired bullets in association with this case, two recovered from the scene and two recovered from the victim's body. All four bullets were .38 caliber and were fired from the same firearm. No gun was recovered in this case for comparison, but Agent Scott testified that the bullets could have been fired from either a .38 Special or a .357 Magnum.

James Russel Davis II, also with the TBI, testified as an expert in microanalysis and gunshot residue. Agent Davis testified that the sample he received from Defendant's hands tested negative for gunshot residue. The sample was collected thirty hours after the shooting.[4] Agent Davis explained that the sooner a sample can be collected the better because the elements in the gunshot residue that are trapped in oils on the hand can be wiped off, washed away, or lost over time. On cross-examination, Agent Davis testified that he did not receive a sample from Codefendant Lay's hands or any clothing for testing.

Greg Fort, a forensic biologist with the TBI, testified as an expert in the field of DNA and serology. Agent Fort tested several items recovered from the crime scene. Bloodstains from the floor of the O'Rear Street residence, a water bottle recovered from the O'Rear Street residence, and the striped sundress recovered from the Belmeade Avenue residence were consistent with the victim's DNA. Agent Fort took samples from

---

[4] Agent Davis initially testified that the sample was collected eight hours after the shooting but was corrected on cross-examination.

the neck and arms of the sundress to determine who may have worn it. The samples contained a mixture of DNA from two individuals, with the major contributor being consistent with Codefendant Lay. Defendant's DNA was not found on any of the items submitted for testing.

On December 11, 2015, the jury convicted Defendant as charged of felony murder and especially aggravated robbery. The trial court imposed an automatic sentence of life in prison for the felony murder conviction and scheduled a sentencing hearing for the especially aggravated robbery conviction. Defendant was subsequently taken into federal custody. In the meantime, trial counsel was relieved from representation and appellate counsel was eventually appointed. The sentencing hearing in this case was held on May 26, 2017. The trial court imposed a sentence of twenty-five years for the especially aggravated robbery conviction, to be served concurrently with the life sentence for felony murder. Defendant filed a motion for new trial, which was denied on October 17, 2017. Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant argues that the evidence is insufficient to support his convictions for felony murder and especially aggravated robbery; that the trial court erred by admitting evidence of Defendant's gang affiliation and rank; that Defendant was deprived of a fair trial by statements made by the prosecutor during closing arguments and by juror misconduct; that the trial court erred in failing to instruct the jury on criminally negligent homicide and facilitation of criminally negligent homicide as lesser-included offenses; and that the cumulative effect of these errors deprived Defendant of a fair trial. We shall address each issue in turn.

*I. Sufficiency of the Evidence*

Defendant argues that the evidence adduced at trial was insufficient to sustain his convictions for felony murder and especially aggravated robbery. Specifically, Defendant contends that Codefendant Lay's testimony was not credible and was not sufficiently corroborated.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of

the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was convicted of felony murder, which, as relevant to this case, is the killing of another during the perpetration of or attempt to perpetrate any robbery. T.C.A. § 39-13-202(a)(2). The only mental state required for felony murder is the intent to commit the underlying felony. T.C.A. § 39-13-202(b). When one defendant enters into a scheme with another to commit one of the enumerated felonies and a death ensues, all defendants are responsible for the death and may be convicted of felony murder regardless of who actually killed the victim or whether the killing was specifically contemplated by the other. *State v. Utley*, 928 S.W.2d 448, 451 (Tenn. Crim. App. 1995). Defendant was also convicted of especially aggravated robbery, which is a robbery accomplished with a deadly weapon and where the victim suffers a serious bodily injury. T.C.A. § 39-13-403. Robbery is defined as the intentional or knowing theft of property from the person of another by violence or putting the other person in fear. T.C.A. § 39-13-401.

In this case, Codefendant Lay was clearly an accomplice as a matter of law. *See State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014) (quoting *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)) ("The test for whether a witness qualifies as an accomplice is 'whether the alleged accomplice could be indicted for the same offense charged against the defendant.'"). A conviction may not be based solely upon the uncorroborated testimony of an accomplice. *Id*. However, the longstanding rule has been that only slight corroboration is required. *See Hawkins v. State*, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971). Our supreme court has explained the corroboration requirement as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also

include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). "In short, the evidence must confirm in some manner that (a) a crime has been committed and (b) the accused committed the crime." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Corroborative evidence establishing only that the defendant was present at the scene of the crime and had the opportunity to commit the offense is not sufficient. *Id.* The sufficiency of the corroborating evidence is a question for the jury. *Bigbee*, 885 S.W.2d at 804.

In the light most favorable to the State, the evidence shows that Codefendant Lay texted Defendant at the 223 number to let him know that the victim was at her house. Defendant told Codefendant Lay that he was on his way with "donkie." Codefendant Lay told Defendant to wait so that it would not look like a "set up." Then, while Codefendant Lay and the victim were engaged in oral sex, two men entered her house and held them at gunpoint. Codefendant Lay identified the men as Defendant and Eric "Donkie" McReynolds. The men demanded money from the victim, and the victim stated that his wallet was in his pants on the floor. Defendant commanded Mr. McReynolds to shoot the victim, and then they left, taking the victim's pants with them. The victim died as a result of multiple gunshot wounds.

Codefendant Lay's testimony was sufficiently corroborated by independent evidence. The text message records confirm that Codefendant Lay, using a phone number registered to her grandmother, communicated with the 223 number regarding a "set up." The victim was discovered nude from the waist down, and the police did not discover any pants, wallet, or identification belonging to the victim at the scene. This corroborates Codefendant Lay's testimony that the victim's pants were taken in the robbery. The medical examiner testified that the victim had bruises on his head and multiple gunshot wounds, corroborating Codefendant Lay's description of Mr. McReynolds's striking the victim about the head and then shooting him multiple times. Ella Lay's testimony that she saw "a couple of figures" fleeing from Codefendant Lay's house immediately after hearing gunshots, in addition to text messages referring to "me n donkie," corroborates Codefendant Lay's testimony that two individuals were involved in the robbery and death of the victim. Defendant's identity as one of those two individuals is corroborated by his association with the 223 number. Defendant told multiple people on Facebook that the 223 number was his cell phone number. Records show that phone calls and text messages were sent between the 223 number and numbers known to belong

to people closely associated with Defendant, including his mother and his girlfriend. Various text messages sent to and from the 223 number in the days leading up to the murder refer to Defendant's name "Stephen," middle name "Doantae," and known nicknames "B-Dogg" and "Thee Thee." On January 9, 2013, the day before the murder, a text message was sent from Defendant's mother's phone number to the 223 number stating "Hey [S]tephen how r u son[?]" These facts, wholly independent of Codefendant Lay's testimony, fairly and legitimately tend to connect Defendant with the crime charged.

Defendant argues on appeal that Codefendant Lay's testimony is not credible due to her plea agreement, her prior inconsistent statements, and the inconsistencies between her testimony and the testimony of other witnesses regarding the state of the victim and the crime scene. However, by its verdict, the jury resolved any conflicts in the evidence and accredited Codefendant Lay's testimony with regard to what happened in the early morning hours of January 10, 2013. We will not second guess such credibility determinations on appeal. Defendant also contends that "[c]ell phone and text records failed to show that the [223] phone number was associated with a phone used solely by [Defendant]," pointing to testimony regarding the use of communal phones and to text messages addressed to a name not associated with Defendant. However, as discussed above, there was plenty of evidence connecting Defendant to that phone number, including his own statements on Facebook, none of which indicated that Defendant was using a shared phone number. Additionally, the name "Park" was explained as being a reference to the Athens Park gang, of which Defendant was known to be a member. The jury weighed that evidence and reconciled any potential conflict in favor of the State's theory. The evidence adduced at trial is sufficient to sustain Defendant's convictions for felony murder and especially aggravated robbery. Defendant is not entitled to relief.

## II. Evidence of Gang Affiliation

Defendant argues that the trial court abused its discretion by allowing the State to introduce evidence of Defendant's gang affiliation and rank. The State responds that the evidence was properly admitted for the purposes of showing identity, intent, motive, and completion of the story. Additionally, the State asserts that the trial court gave a proper limiting instruction that the jury could only consider the evidence of Defendant's gang affiliation and rank for the stated purposes.

This Court has previously held that evidence of gang affiliation is character evidence subject to Tennessee Rule of Evidence 404(b). *See, e.g., State v. Shasta Jackson*, No. E2014-01387-CCA-R3-CD, 2015 WL 6756318, at *9 (Tenn. Crim. App. Nov. 5, 2015), *perm. app. denied* (Tenn. May 5, 2016); *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App. June 27, 2001), *no perm. app. filed*. Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts" is

inadmissible character evidence if offered to show a defendant's "action in conformity with [a] character trait." *See also State v. Parton*, 694 S.W.2d 299, 302-03 (Tenn. 1997). "The general rule excluding such evidence is based on the recognition that the evidence may lead a jury to convict a defendant for an apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." *Orlando Crayton*, 2001 WL 720612, at *3 (citing *State v. Bordis*, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995); *State v. Tizard*, 897 S.W.2d 732, 743-44 (Tenn. Crim. App. 1994)).

However, such evidence may be admissible for other purposes, such as to establish the defendant's identity, motive, or intent; to rebut a defense of mistake or accident; to show a common scheme or plan; or to provide necessary contextual background or a completion of the story. *See* Tenn. R. Evid. 404(b), Advisory Comm. Cmts.; *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn. 2000). In order to admit other act evidence for one or more of these purposes, the following requirements must be met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Rule 404(b) has been described as a rule of exclusion rather than inclusion, and "[t]rial courts have been encouraged to take a 'restrictive approach of [Rule] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury.'" *Jones*, 450 S.W.3d at 891 (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)). However, if the trial court has substantially complied with the requirements of the Rule, we will review the trial court's decision to admit or exclude the other act evidence under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." *Jones*, 450 S.W.3d at 892 (internal quotation and citation omitted).

Prior to trial, the State provided Defendant with notice of its intent to introduce evidence of his affiliation with the Athens Park Bloods and his rank within that gang over Codefendant Lay and Eric McReynolds. The State contended that this evidence was probative of Defendant's identity, intent, and motive as well as provided a completion of the story. On the morning of the second day of trial, the trial court held a hearing outside the presence of the jury regarding the State's motion.

During the hearing, Codefendant Lay testified that she knew Defendant through their mutual affiliation with the Athens Park Bloods. She began speaking to Defendant on the phone in 2010 or 2011 while he was in prison, and she met him in person at the end of 2012. She testified that Defendant held the rank of Y-O-G, or young original gangster, which was higher than her rank of Y-G, or young gangster. Eric McReynolds, also known as Donkie, was also a member of the Athens Park gang. At some points in her testimony, Codefendant Lay testified that she did not know Mr. McReynolds's rank within the gang; at other points, she testified that he had no rank within the gang. She testified that there are people within the gang who hold no rank, also known as Little Homies. Codefendant Lay testified that Defendant was a Big Homie and had authority over her and Mr. McReynolds due to his higher rank within the gang. Codefendant Lay knew that Defendant and Mr. McReynolds originally met during a gang meeting, but she denied that "part of their relationship within the gang" involved committing robberies. Codefendant Lay had heard from Defendant about his committing robberies with other members of the gang.

Codefendant Lay testified that the victim, her ex-boyfriend with whom she did drugs and was still sexually involved, called her about dancing for him. Defendant wanted her to go "so that he could go rob everybody in the house." However, that plan fell through when she and the victim could not settle on a price for her dancing. Codefendant Lay then testified to the events of January 10, 2013. She testified that Mr. McReynolds shot the victim because Defendant told him to. When asked, "Did you think you had any choice in the matter of whether [Defendant] was going to rob [the victim] or not?," Codefendant Lay responded, "Yes, I think I had a choice." With regard to her lying to the police, Codefendant Lay stated, "I didn't want to get tied up in no murder homicide, and at the time [Defendant] was my boyfriend so I was really just trying to protect the both of us." Codefendant Lay denied being "threatened directly" if she testified against Defendant but stated that she had "been hearing . . . a lot."

After both she and Defendant were arrested, Codefendant Lay remained in communication with Defendant by letters exchanged during court appearances. One of those letters, which was written by Defendant and signed "Daddy," mentioned Athens Park as "the established criminal enterprise" in reference to the federal RICO statute. The letter also mentioned "Lare Dog," whom Codefendant Lay identified as "a Big Homie on the hood" or someone who has a high rank within the gang. The State also

entered into evidence some of the text message logs for the 223 number. Codefendant Lay identified the text she sent at 3:22 a.m. on January 10, 2013, to tell Defendant that the victim was at her house. The logs also contained a text from the 223 number to the number "706-944-2xxx" at 3:33 a.m. on January 10, 2013, stating "Kum outside to da dead end[.]" The State contended that the 706 number belonged to "donkie" and that the message showed that Defendant was "recruiting people" for the robbery. Another message sent from the 223 number to the 706 number on January 5, 2013, stated, "We settin up da set up nw blood[,]" which the State contended showed a "continual relationship" between Defendant and the owner of the 706 number and their affiliation with the Blood gang. The State pointed out another text sent by the 223 number on January 9, 2013, that stated, "Aye tell lil joe to kall his big homie on dis line!," which the State contended was Defendant referring to himself as a Big Homie.

On cross-examination, Codefendant Lay agreed that her relationship with Defendant had nothing to do with the gang. She testified that they had a sexual or romantic relationship, and she considered him her boyfriend. Codefendant Lay agreed that in her initial statement to the police, she denied that she was present during the robbery. She then told the police that she was present but that the robbery was not supposed to happen because she told Defendant not to come. In this second portion of her statement, Codefendant Lay told the police that Defendant was affiliated with a gang but that he did not have any rank within the gang. Codefendant Lay testified that she was telling the truth when she testified that Defendant actually does have rank within the gang. Codefendant Lay testified that she was telling the truth in her statement when she said she was no longer involved in the gang and that she "wasn't into it when [Defendant] became (sic) in [her] life." Codefendant Lay clarified that other than knowing that Mr. McReynolds was not the "head of a gang," she did not know what his rank was within the gang. She also testified, "The robbery wasn't (sic) took place because it was gang related[.]"

The trial court found that there was clear and convincing evidence that Defendant was a member of a gang in January 2013 and that he held rank within the gang. The trial court stated that it was not sure if there was a "contextual gap" in the relationship between the parties when Codefendant Lay testified that her relationship with Defendant was romantic rather than gang-related. The State conceded that it was not asserting that "this particular robbery took place in the furtherance of any gang mission or any gang over-arching role or purpose." The State argued that "the fact that they have an association outside of the crime is hugely relevant to the identity of the parties involved" and that identity was a primary issue in the case. The State also argued that the evidence was relevant to show Defendant's intent to commit the robbery and to explain his ability to command his codefendants by showing his authority over them.

After taking the matter under advisement, the trial court ruled as follows:

In this case the State argues that evidence of [Defendant's] membership, and that of Mr. McReynolds, in the Athens Park Blood gang is relevant for the nonpropensity purposes of intent, identity, motive, and completion of the story. It argues that the proof establishes identity and completion of the story because the proof provides a logical reason why [Defendant] and Mr. McReynolds and [Codefendant] Lay, and perhaps others, would be involved in a robbery together, and help establish [Defendant's] identity as part of the group involved in the killing of Mr. Glenn.

As the Supreme Court has recognized, events do not occur in a vacuum, and in many cases knowledge of the events surrounding the commission of a crime may be necessary for the jury to realistically evaluate the evidence.

This Court believes that exclusion of the evidence subject to the motion would create a conceptual void in the presentation of the case. And that this void would likely result in significant jury confusion concerning the material issues or evidence in the case. So therefore the Court finds that the evidence is relevant as contextual background.

. . . .

In this case the State argues that the proof that [Defendant] came to Carm[i]sha Lay's house around 4 o'clock a.m. on January 10, 2013, with a fellow gang member over whom the [D]efendant had authority, and that they were armed, is strong evidence that the [D]efendant intended to rob Mr. Glenn. The Court agrees.

The evidence is relevant to the jury's consideration of the [D]efendant's motive in committing the robbery, and intent in committing the robbery, and helps establish that time, place, causation and continuity of the action between the robbery and the killing of Mr. Glenn. Pursuant to Rule 404(b) then the Court therefore makes a finding that the proof of gang affiliation and the [D]efendant's rank in the group is relevant to the contextual background of the issues to identity and to intent.

Also pursuant to 404(b), the Court finds that the [D]efendant's proof [sic] of gang affiliation is shown by clear and convincing evidence, and that the probative value of the evidence is not outweighed by the danger of unfair prejudice. However, also pursuant to Rule 404(b) the Court finds

that the [D]efendant's ranking inside of the group has not been shown by clear and convincing evidence. The proof today established on careful cross-examination of the only witness offered by the State was that she could not be sure what the rank of Mr. McReynolds was inside of the gang, except to say that he was not the leader. The Court also makes note that [Codefendant] Lay has given previous statements before, not able to make a comparative evaluation as to the ranks of [Defendant] and others in the group, and so the Court does not find by clear and convincing evidence that [Defendant's] ranking inside of the group outranks anyone other than perhaps [Codefendant] Lay herself.

The trial court found clear and convincing evidence of Defendant's rank within the gang over Codefendant Lay, but excluded any testimony that Defendant outranked Mr. McReynolds. The trial court found that the probative value of the evidence outweighed any potential unfair prejudice.

The trial court fully complied with the procedure set forth in Rule 404(b); therefore, we apply an abuse of discretion standard of review to its decision to admit evidence of Defendant's affiliation with the Athens Park Bloods and his rank within that gang over Codefendant Lay. In finding that the evidence provided necessary contextual background, the trial court applied the correct legal standard by finding that the absence of the evidence would create a conceptual void that would likely result in significant jury confusion. *See Gilliland*, 22 S.W.3d at 272. While the planning and execution of the robbery may not have been in furtherance of a gang mission or to otherwise benefit the gang, the fact that the three people involved happen to all be members of the same gang explain why they would come together to commit this robbery. Moreover, Codefendant Lay's affiliation with Defendant through the gang made it more likely that her identification of him was accurate. Identity was certainly a key issue in this case. *See Jones*, 450 S.W.3d at 892 (noting that defendant's identity must actually be a contested issue before the other act evidence is admissible for that purpose). Defendant contends that the relevance of this evidence was outweighed by the danger of unfair prejudice because Codefendant Lay testified that her relationship with Defendant was romantic rather than gang-related. While it is true that Codefendant Lay characterized Defendant as her boyfriend, Defendant contradicted this testimony in his statement to the police, in which he stated that, although they had had sex, they "were never together" and named someone else as his girlfriend. Additionally, any association between Defendant and Codefendant Lay outside of the gang would not explain their association with Mr. McReynolds and his role in the robbery and shooting of the victim. The trial court did not abuse its discretion in allowing the State to introduce this evidence to help establish Defendant's identity and to provide contextual background and a completion of the story.

The trial court also admitted the evidence on the issue of Defendant's intent, finding that Defendant's presence at the scene with another alleged gang member while they were both armed indicated that they intended to rob the victim. Intent was a material issue in this case because Defendant was charged with felony murder, for which the only required mental state is the intent to commit the underlying felony, in this case robbery. *See* T.C.A. § 39-13-202(b). "[W]here the crime charged is one requiring specific intent, the prosecutor may use 404(b) evidence to prove that the defendant acted with the specific intent notwithstanding any defense the defendant might raise." *State v. Donald Mickens*, No. W2009-00586-CCA-R3-CD, 2010 WL 2697164, at *15 (Tenn. Crim. App. July 8, 2010) (quoting *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994)), *no perm. app. filed*. We acknowledge that, unlike other cases in which a defendant's gang affiliation has been deemed admissible to prove intent, there was no gang-related motive behind the robbery or the selection of the victim in this case. *See Shasta Jackson*, 2015 WL 6756318, at *9 (concluding that the defendant's membership in a "group" that carried guns and protected each other during fights was admissible to show her motive in participating in multiple altercations with another group which eventually led to the shooting of the victim); *State v. Ronald Eugene Brewer, Jr.*, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *17 (Tenn. Crim. App. July 14, 2011) (concluding that evidence of the defendant's gang activity was probative of "the State's theory . . . that the rival gang affiliations of the [d]efendant and [the victim] provided the motive for the shooting"), *perm. app. denied* (Tenn. Sept. 21, 2011). Additionally, there was no evidence presented that the robbery was committed in a manner indicative of membership in a specific gang. *See State v. Robert Edward Fritts*, No. E2012-02233-CCA-R3-CD, 2014 WL 545474, at *15-16 (Tenn. Crim. App. Feb. 10, 2014) (concluding that the defendant's membership in the ICP gang was relevant to identity and intent because it explained "the violent manner in which the victim was killed, the use of a hatchet as the murder weapon, and the presence of white paint on the victim's hand and face"), *perm. app. denied* (Tenn. Sept. 19, 2014). Admitting evidence of Defendant's gang affiliation to prove his intent under the facts of this case potentially runs the risk of merely showing that Defendant "is the kind of person who would not scruple to commit the kind of offense with which he is charged," *Parton*, 694 S.W.2d at 302, which is the very propensity purpose Rule 404(b) is designed to exclude. *Cf. State v. Donald Joseph Powell*, No. M2014-01132-CCA-R3-CD, 2015 WL 3563106, at *9 n.3 (Tenn. Crim. App. June 8, 2015) ("It looks like propensity, smells like it, kind of walks like it, but it's not. That's not what it's being used for. It's being used for the issue of intent."), *no perm. app. filed*. However, because the trial court also properly admitted the evidence to establish Defendant's identity and his relationship with the other parties, the danger of unfair prejudice did not outweigh the probative value of the evidence. Furthermore, the trial court instructed the jury to consider the evidence of Defendant's gang affiliation only for the limited purposes of identity, intent, motive, and completion of the story, and the jury is presumed to follow the instructions of the court. *See State v. Banks*, 271

S.W.3d 90, 134 (Tenn. 2008). The trial court did not abuse its discretion, and Defendant is not entitled to relief.

### III. Prosecutor's Closing Argument

Defendant argues that he was deprived of a fair trial when the prosecution misled the jury during closing argument into thinking that there was no bloody cigarette butt found on the victim's face prior to the autopsy. Defendant points to the following statements made by the prosecutor during rebuttal closing argument:

> The testimony about the cigarette butt is that a person that received Mr. Glenn's body in the medical examiner's office when they opened the receiving bag took it off of him. That's not what the defense represents the truth is. [Trial counsel] stood up right here just now and told you it was collected from the crime scene. That is not true. That is absolutely not true. [. . .] Detective Fuller [. . .] didn't see any cigarette butt because it wasn't there. [. . .] But, see, all the defense needs is just this idea that there's a mysterious cigarette butt from the crime scene, which there's no evidence that supports that, if he can just get one, if any of his little theories are working, just one, he gets to move right on out of here. It's just words. It's not supported by any evidence whatsoever.[5]

Defendant contends that the prosecutor's closing argument "call[ed] into question why the defense focuse[d] on the cigarette butt, that the defense [wa]s attempting to distract the jury with one of his 'little theories,' manufacture investigatory flaws, or pull a fast one." Defendant asserts that the statement was "intended to sway the jury to believe that the defense attorney [wa]s being dishonest." The State argues that the issue is waived because Defendant failed to make a contemporaneous objection to the remarks during closing argument. Additionally, the State argues that Defendant mischaracterizes the prosecutor's statements, which were merely that there was no evidence that the bloody cigarette butt was found at the crime scene rather than that it did not exist.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing arguments "have special importance in the adversarial process," allowing the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *Banks*, 271 S.W.3d at 130. Attorneys "should be given great latitude in both the style and the substance of their arguments." *Id.* at 131. However, "a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be

---

[5] Significantly, the bracketed ellipses were not included in Defendant's quotation of the prosecutor's argument in his appellate brief.

pertinent to the issues in the case." *Id*. Although not exhaustive, this Court has recognized five general categories of improper statements during the prosecution's closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the defendant; or (5) arguing or referring to facts outside the record that are not matters of common knowledge. *See State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). However, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Banks*, 271 S.W.3d at 131.

Defendant did not object to the prosecutor's supposedly improper statements during rebuttal closing argument. The failure to raise a contemporaneous objection to an allegedly improper closing argument waives the issue, and a defendant will not be entitled to relief unless he can demonstrate that the prosecutor's remarks constituted plain error.[6] *State v. Fusco*, 404 S.W.3d 504, 519 (Tenn. Crim. App. 2012); *see* Tenn. R. App. P. 36. There are five factors that must be established before this Court will grant plain error relief:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The burden is on the accused to persuade the appellate court that the trial court committed plain error and that the error was of "such a great magnitude that it probably changed the outcome of the trial." *Id.* at 283 (quoting *Adkisson*, 899 S.W.2d at 642); *see also* Tenn. R. App. P. 36(b) (relief may be granted when an "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process"). "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283.

In this case, there was no breach of a clear and unequivocal rule of law. We note that the way in which Defendant quoted the prosecutor's argument removed some of the context, thereby mischaracterizing his statements with regard to the bloody cigarette butt.

---

[6] Defendant did not argue for plain error relief or acknowledge the failure to object in his appellate brief.

After noting that trial counsel "told you it was collected from the crime scene," the prosecutor summarized the testimony of both Investigator Mardis and Detective Fuller, neither of whom found a cigarette butt at the crime scene. These statements accurately reflected the testimony of Investigator Mardis and Detective Fuller. After summarizing Detective Fuller's testimony and immediately before referring to the "mysterious cigarette butt from the crime scene," the prosecutor stated,

> By the time EMS comes in and deals with the body, gets him loaded up, gets him out of the house, gets his face cleaned up, gets him over to the medical examiner's office, putting him in this bag, there's a cigarette butt in the receiving bag that's stuck to his face. A bloody cigarette butt stuck to a bloody face of the victim in a homicide case. Whose blood do you think is going to be on it[?] He's bleeding from his mouth. That's the proof in the case.

While the activities of the EMS personnel were not testified to at trial, it is a rational inference based on the differences between the condition of the body at the crime scene as testified to by several witnesses and the condition of the body at the medical examiner's office as depicted in photographs from the autopsy. The prosecutor's statements actually acknowledged that "the proof in the case" was that there was "[a] bloody cigarette butt stuck to a bloody face of the victim."[7] The prosecutor was not arguing that there was "no evidence" of a bloody cigarette butt, rather that there was "no evidence" that it was found at the crime scene or that it held any potential evidentiary significance.

Thus, the prosecutor's argument was based upon the evidence introduced at trial, and he did not intentionally misstate the evidence or mislead the jury as to the inferences it could draw from the evidence. *See Goltz*, 111 S.W.3d at 5-6. Additionally, while the prosecutor's reference to the bloody cigarette butt as "one . . . of [trial counsel's] little theories" could potentially be characterized as intending to inflame the passions or prejudices of the jury by implying that trial counsel was being dishonest, it was not so egregious or inflammatory that it may have affected the outcome of the trial to Defendant's prejudice. *See Banks*, 271 S.W.3d at 131. Moreover, Defendant has failed

---

[7] During the motion for new trial hearing, an evidence inventory report listing a "[b]loody cigarette butt removed from the left side of Victim's face by Forensic Technician Kim Miller" and a supplemental police report from Investigator Montijo describing his role in the investigation, including collecting the cigarette butt along with other evidence from the medical examiner's office, were entered into evidence. However, neither of these reports was entered into evidence at trial. The only evidence before the jury of this "mysterious" cigarette butt was trial counsel's questions on cross-examination of Investigator Mardis and Dr. Metcalfe, both of whom denied finding a cigarette butt and turning it over to Investigator Montijo.

to establish that the failure to object to the prosecutor's closing argument was not a tactical decision. *See Smith*, 24 S.W.3d at 282. Therefore, Defendant is not entitled to plain error relief.

## IV. Juror Misconduct

Defendant argues that he was deprived of his right to a fair trial due to the misconduct of a juror, who is identified in the record as Juror No. 53 and who served as the jury foreperson. During voir dire, Juror No. 53 disclosed that his brother was criminal defense attorney Jonathan Turner. Defendant asserts that Juror No. 53 did not disclose the fact that Mr. Turner represented Defendant during his preliminary hearing in General Sessions Court or that Mr. Turner's law partner, Bill Speek, represented Codefendant Lay in Criminal Court. Additionally, during the course of the trial, Juror No. 53 disclosed to a court officer that his daughter was best friends with the daughter of Investigator Montijo, who in Defendant's words was "the police officer who collected the 'mysterious bloody cigarette butt' that disappeared from [S]tate's evidence."[8] According to Defendant, "To say that Juror No. 53's numerous relationships to the case raise questions as to his ability to render an impartial verdict would be an extreme understatement." Defendant argues that Juror No. 53's failure to disclose that his brother was law partners with Codefendant Lay's attorney deprived trial counsel of the opportunity to inquire into any potential bias or prejudice. Defendant also argues that the trial court erred by failing to sua sponte excuse Juror No. 53 for cause. The State responds that Defendant failed to challenge Juror No. 53 for cause and that the record does not establish that Juror No. 53 was aware of any connection to the case that he failed to disclose or that would prejudice him against Defendant.

Defendant first raised his challenge to Juror No. 53 in his motion for new trial filed by appellate counsel. At the hearing on the motion for new trial, attorney Jonathan Turner testified that he was hired in January 2013 to represent Defendant on this case in General Sessions Court, and he only represented Defendant through the preliminary hearing. Mr. Turner testified that he and Bill Speek became law partners in September 2013 after Mr. Turner's representation of Defendant had concluded and that they created an ethical screen to prevent any conflict of interest with Mr. Speek's representation of Codefendant Lay. Mr. Turner knew that his brother served on the jury in Defendant's trial. Mr. Turner testified that he never discussed work with his brother and that his brother did not know of Mr. Turner's involvement in Defendant's case. Mr. Turner testified that Juror No. 53 called him after the trial was over and the verdict had been

---

[8] Although raised in his motion for new trial, Defendant does not raise on appeal an issue with regard to the State's alleged loss of this evidence under *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). In fact, the State asserted during the motion for new trial hearing that the cigarette butt was not lost or destroyed; it was just not sent to the TBI for testing, and trial counsel did not request any independent testing be done.

rendered, told Mr. Turner that he disclosed their relationship during voir dire, and stated that he was surprised that nobody asked any further questions about it. Mr. Turner testified that he asked his brother questions about the jury selection and deliberation process but that they did not discuss the details of the case. Mr. Turner testified that he saw his brother on the jury panel during voir dire and informed trial counsel of their relationship. Mr. Turner testified that trial counsel would have known that Mr. Turner had previously represented Defendant because the two had met to discuss the case and share some of the records. Juror No. 53 did not testify at the motion for new trial hearing.

The trial court denied relief, finding that the purpose of voir dire is to uncover information that is not otherwise known to the parties so that they may intelligently exercise any peremptory or for-cause challenges. The trial court found that when Juror No. 53 disclosed that his brother was Mr. Turner, trial counsel would have been aware of Mr. Turner's connection to the case and relationship with Mr. Speek. "In other words," the court stated, "there was no information that was being withheld that would have interfered with [trial counsel's] intelligent exercise of peremptory challenges or his intelligent exercise of for-cause challenges[.]" Though the trial court's records contained Mr. Turner's name as Defendant's prior attorney, the trial court admitted that it did not recall that information during voir dire and would have had no basis for sua sponte excusing Juror No. 53 for cause under Tennessee Rule of Criminal Procedure 24.

The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution guarantee criminal defendants the right to trial by an impartial jury. Specifically, every defendant is guaranteed "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting *Toombs v. State*, 270 S.W.2d 649, 650 (Tenn. 1954)). Voir dire serves the essential purpose of allowing questioning of potential jurors regarding their qualifications, backgrounds, associations, and experiences to reveal any potential biases and to allow counsel to intelligently exercise any challenges. *See Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011) (quoting *State v. Onidas*, 635 S.W.2d 516, 517 (Tenn. 1982)); Tenn. R. Crim. P. 24(b). "'The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial.'" *Smith*, 357 S.W.3d at 347 (quoting *State v. Hugueley*, 185 S.W.3d 356, 390 (Tenn. 2006)).

Challenges to a juror's qualifications typically fall into two categories: proper defectum ("on account of defect") and proper affectum ("on account of prejudice"). *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (citing *Akins*, 867 S.W.2d at 355). Proper defectum challenges are "based upon general disqualifications, such as alienage, family relationship, or statutory mandate," and must be raised before the return of the verdict. *Id*. Proper affectum challenges, on the other hand, are "based upon

the existence of bias, prejudice, or partiality towards one party in the litigation actually shown to exist or presumed to exist from circumstances" and may be raised after the verdict in a motion for new trial. *Id*.

"Since full knowledge of the facts which might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges, jurors are obligated to make 'full and truthful answers . . . neither falsely stating any fact nor concealing any material matter.'" *Akins*, 867 S.W.2d at 355 (quoting 47 Am. Jur. 2d, Jury § 208 (1969)). "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." *Id*. (citing *Durham v. State*, 188 S.W.2d 555, 559 (Tenn. 1945)). A juror's willful concealment of a close personal or familial relationship with one of the parties involved at trial may justify a presumption of bias. *See Hugueley*, 185 S.W.3d at 378 (citing *Toombs*, 270 S.W.2d at 651). The presumption of bias, however, may be dispelled by an absence of actual favor or partiality by the juror. *See State v. Taylor*, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983).

In this case, there was no willful concealment or failure to disclose on the part of Juror No. 53. He admitted during voir dire that his brother-in-law was the elected Public Defender, Steve Smith, and that his brother was attorney Jonathan Turner of the law firm Speek, Webb, Turner, and Newkirk. Juror No. 53's disclosed relationships with the defense bar are insufficient to raise a presumption of partiality. *Cf. Taylor*, 669 S.W.2d at 699 (holding that "the alleged relationship of jurors to people connected with law enforcement . . . does not give rise to an inherently prejudicial situation in and of itself"). According to Mr. Turner's testimony at the motion for new trial, Juror No. 53 did not know at the time of voir dire that Mr. Turner represented Defendant in General Sessions Court; however, trial counsel would have known of Mr. Turner's involvement in the case and could have inquired further into any potential prejudice or exposure to extraneous information. As to Juror No. 53's familiarity with Mr. Speek, Juror No. 53 admitted during voir dire that his brother was affiliated with Mr. Speek's law firm even though Mr. Speek was not mentioned specifically by name. Again, trial counsel would have been aware of Mr. Speek's involvement in the case as Codefendant Lay's attorney and could have inquired further. We do not consider Juror No. 53's failure to specifically alert the trial court of his familiarity with Mr. Speek when his name was briefly mentioned during Codefendant Lay's testimony—the way Juror No. 53 had done when Investigator Montijo's name was mentioned during testimony—to be a willful concealment or failure to disclose such as would justify a presumption of partiality. Moreover, Defendant has failed to present any evidence that Juror No. 53 was actually prejudiced against him or was exposed to any extraneous information about the case. *See Hugueley*, 185 S.W.3d at 379 (quoting *Bristow v. State*, 219 A.2d 33, 34 (Md. 1966)) ("'Although the relationship of a juror to one of the witnesses may present an opportunity for prejudice, bias will not be presumed and the defendant is not relieved of the burden of presenting facts in

addition to mere relationship which would give rise to a showing of actual prejudice.'"); *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980) (recognizing that "[t]he burden is on the defendant to demonstrate that the juror was in some way biased or prejudiced" when the juror disclosed a social relationship with one of the prosecuting attorneys).

Defendant also argues that "the trial court should have excused Juror No. 53 on its own initiative . . . [g]iven the multiple serious questions raised regarding Juror No. 53's ability to remain impartial and the likelihood of prejudicial knowledge of the case, especially when more questions arose during trial[.]" Tennessee Rule of Criminal Procedure 24 states that a trial court "shall excuse that juror from the trial of the case if the court is of the opinion that there are grounds for challenge for cause." Tenn. R. Crim. P. 24(c)(1). This rule gives the trial court "the right to excuse a juror for cause without examination of counsel." *State v. Sexton*, 368 S.W.3d 371, 391 (Tenn. 2012) (quoting *State v. Hutchison*, 898 S.W.2d 161, 167 (Tenn. 1994)). "However, as our supreme court has instructed, 'A defendant must not only exhaust his peremptory challenges, but he must also challenge or offer to challenge any additional prospective juror in order to complain on appeal that the trial judge's error in refusing to excuse for cause rendered his jury not impartial.'" *State v. Kiser*, 284 S.W.3d 227, 280 (Tenn. 2009) (appendix) (quoting *State v. Irick*, 762 S.W.2d 121, 125 (Tenn. 1988)). Failure to do so waives the issue on appeal. *Id*. (citing Tenn. R. App. P. 36(a)). However, the issue may be reviewed for plain error. *See id.* at 280-81.

Defendant did not offer to challenge Juror No. 53 and, thus, has waived plenary review of the trial court's supposed error in failing to excuse Juror No. 53 for cause. Additionally, Defendant did not argue for and has not established that he is entitled to plain error relief. *See Smith*, 24 S.W.3d at 282 (listing the five prerequisites for plain error relief). Defendant has made no showing that counsel's failure to challenge Juror No. 53 was not a tactical decision, especially given that Juror No. 53's connections to the defense bar may have made him more favorable to the defense. Moreover, Defendant has failed to establish a breach of a clear and unequivocal rule of law by failing to show that Juror No. 53 should have been excused for cause due to exposure to potentially prejudicial information or any other ground provided by law. *See* Tenn. R. Crim. P. 24(c)(2). Therefore, Defendant is not entitled to relief.

### *V. Lesser-Included Offenses*

Defendant argues that the trial court erred in failing to instruct the jury on the lesser-included offenses of criminally negligent homicide and facilitation of criminally negligent homicide. The State responds that Defendant waived the issue by failing to make a written request for the instructions, failing to object to the omission, and actually agreeing at trial that the instructions were not supported by the proof.

Upon written request by either party, "the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment[.]" T.C.A. § 40-18-110(a). In determining whether an offense is a lesser-included offense of the charged crime, the trial court should consider the evidence "in the light most favorable to the existence of the lesser-included offense." *State v. Ely*, 48 S.W.3d 710, 722 (Tenn. 2001). When a defendant is charged with a felony through criminal responsibility for the actions of another, facilitation of the felony is a lesser-included offense. *State v. Fowler*, 23 S.W.3d 285, 288 (Tenn. 2000). In the absence of a written request, a trial court may instruct a jury on lesser-included offenses, but a defendant is not entitled to such an instruction, and the failure of the trial court to give such an instruction is waived as an issue on appeal. T.C.A. § 40-18-110(b), (c). However, the issue may be reviewed for plain error. *State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006).

Defendant did not submit a written request to the trial court for instructions on criminally negligent homicide and facilitation of criminally negligent homicide; therefore, he has waived plenary review of the issue. Additionally, Defendant did not request and has failed to establish that he is entitled to plain error relief. *See Smith*, 24 S.W.3d at 282 (listing the five prerequisites for plain error relief). The record shows that the trial court instructed the jury on second degree murder, facilitation of second degree murder, reckless homicide, and facilitation of reckless homicide as lesser-included offenses of first degree felony murder. At the charge conference, the prosecutor suggested that an instruction on criminally negligent homicide was not warranted based on the proof in the record, and trial counsel agreed that there was no proof of negligence. The trial court omitted the instructions on criminally negligent homicide and facilitation of criminally negligent homicide, and trial counsel did not object. Defendant has failed to show that this failure to object was not a strategic decision on the part of trial counsel. Moreover, consideration of the issue is not necessary to do substantial justice. The Tennessee Supreme Court has indicated that when a jury receives a sequential instruction as well as an instruction on immediate lesser-included offenses, as was the case here, the omission of additional lesser-included offenses is harmless error. *See State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998) (noting that "by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses"). Defendant is not entitled to relief.

## VI. Cumulative Error

Finally, Defendant argues that his convictions should be reversed because the cumulative effect of the alleged errors in the trial court deprived him of a fair trial. *See State v. Clark*, 452 S.W.3d 268, 299 (Tenn. 2014) (recognizing that multiple errors, though individually harmless, "may in the aggregate violate a defendant's due process

right to a fair trial"). Because we have found no error in the trial court below, we decline to provide relief via the cumulative error doctrine. *See State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

## *Conclusion*

Based on the foregoing, we affirm the judgments of the trial court.


_____
TIMOTHY L. EASTER, JUDGE